## Case No. 11,590.

### RAY v. DONNELL et al.

[4 McLean, 504; [1] 6 West. Law J. 529.]

Circuit Court, D. Indiana. May Term, 1849.

SLAVERY — ACTION FOR HARBORING FUGITIVE SLAVES — KNOWLEDGE — REMOVAL OF SLAVES—EVIDENCE—WITNESS.

1. An action against one or more persons, for harboring or secreting fugitives from labor, whether brought for the penalty or the value of the slaves, is founded on the constitution of the United States and act of congress [of 1793 (1 Stat. 302)].

2. In such an action, the plaintiff must prove the ownership of the slaves, and that they escaped from his service.

[1] [Reported by Hon. John McLean, Circuit Justice.]

3. A removal of the slaves from the place where they had been secreted with the view of returning them to their master, so that they were enabled to escape from the pursuit of the master, is a harboring and secreting of them within the act of congress.

4. The circumstances under which they were removed, may be sufficient to show that the person removing them, had knowledge that they were fugitives from labor.

5. The evidence must preponderate in favor of the plaintiff, to authorize a verdict for him.

6. Whether a verdict for the plaintiff extinguishes his right to the fugitives, is not a question for the jury. They are to give damages for the injury done to the plaintiff by the acts of the defendants. And if by such acts, the services of the fugitives have become lost to the plaintiff, the value of these services will be the damages sustained.

7. Where the credibility of a witness is so impeached as to create strong doubts as to the truth of his testimony, the jury may decide the controversy on the other evidence in the case.

8. Where the general character of a witness has not been impeached, though he may have been contradicted by other witnesses, his general good character can not be proved.

At law.

Marshal & Davidson, for plaintiff.
Smith & Stevens, for defendants.

OPINION OF THE COURT. Gentlemen of the Jury: This action is founded upon the constitution of the United States, and the act of congress of 1793. As in other and similar cases, the provisions of the constitution and of the act should be considered by the jury.

The second section of the fourth article of the constitution provides, that "no person held to service or labor in one state, under the laws thereof, escaping into another state, shall, in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered up on claim of the party to whom such service or labor may be due." By the third section of the above act, respecting "fugitives from labor," it is declared, "that when a person held to labor in any of the United States, etc., under the laws thereof shall escape into any other of the said states, the person to whom such labor is due, his agent, or attorney, may seize and arrest any such fugitive," etc. And the fourth section provides, that, "when any person shall knowingly and willingly obstruct or hinder such claimant, his agent, or attorney, in so seizing or arresting such fugitive from labor, etc., or shall harbor or conceal such persons, after notice that he or she was a fugitive from labor as aforesaid, shall, for either of said offenses, forfeit and pay the sum of five hundred dollars, etc.; saving, moreover, to the person claiming such labor, or service, his right of action for, or on account of, the said injuries, or either of them."

This action is not brought for the penalty under either of the above provisions, but for the value of the slaves. That the plaintiff resides in Kemble county, Kentucky, was the owner of the woman Caroline and her four children, Frances, John, Amanda and Henry, and that they escaped from his services on Sunday evening the 31st October, 1847, is proved by John W. Coleman, and William Ray, the son of the plaintiff. They described the woman as about thirty-five years of age, of a dark color, and the children as of light complexion, the youngest being the darkest. On Monday evening the fugitives were discovered by Woodson Clark, a witness, near Clarksburgh, Indiana, in a house nearly filled with clover hay, on Peyton's farm, which adjoined that of the witness. His attention was drawn to the house by hearing some one coughing, and he there found the woman and her children. She stated to him that she belonged to Ray, and the witness then recognized them, having seen the woman and some of the children at Ray's, who kept a public house, at the seat of justice in Kemble county. The witness took the fugitives to his own house, and from thence they were taken by his son, who lived near, and to secure them they were placed in a fodder house near the stable. The professed object in secreting the fugitives was, to detain them for their master, to whom Woodson Clark despatched a messenger. On the same evening the fugitives were removed from the fodder house, and by that means made their escape. Their master, it seems, has never recovered them. And the important question is, who aided them in their escape from the place of concealment.

Judge Hopkins states that early in November, 1847, Luther A. Donnell, the defendant, Robert Hamilton and Cyrus Hamilton, made complaint to him that Woodson Clark had certain colored persons concealed in his house, who did not belong to the neighborhood, and a writ of habeas corpus was applied for by Donnell to bring them before the judge. The writ was allowed, and they were directed by the judge to apply to Hamilton, a respectable lawyer at Greensburgh, the seat of justice for the county, who acted as deputy clerk, and request him to make out the writ. On Monday evening, the 1st of November, Coleman, Ray and others who were in pursuit of the fugitives, arrived at Greensburgh. And after taking refreshments, making inquiries respecting the fugitives, they set out for Clarksburgh in company with Joseph McKinney, at about eight o'clock in the evening. After riding about nine miles, hearing the tramp of horses in their rear, traveling at a rapid rate, they halted under a shade, at one side of the road. Two men passed them riding on a fast trot, with a passing salutation. Having had their suspicions excited, Mr. McKinney and his company resolved to keep pace with them. McKinney knew that Donnell was in Greensburgh when they left it, and he afterwards found that Donnell was one of the men who passed them, and that Robert Hamilton was the other. They traveled together a short distance, when, after

a consultation between the two, Donnell turned off the road, but Hamilton continued about two miles further and then turned about. This was between twelve and one o'clock at night. Hamilton left them about three quarters of a mile from Woodson Clark's.

John Emry says that on Monday evening, November 1st, 1847, Donnell put into his hands, between midnight and daylight, a writ of habeas corpus. Witness was a constable, and acted as deputy sheriff, and he accompanied Donnell immediately to Woodson Clark's; on the same night, Woodson Clark states, at about three o'clock, Luther Donnell, Emry, a constable, William Hamilton, one of the defendants, and his brother Robert came to his house. Donnell said to him that he had a warrant to search his house for certain negroes; the witness lighted a candle, showed him through the house, and not finding any one, Donnell said to Hamilton: They are not here; they must be at one of the sons of the witness. They left in the direction of his son Richard's house, Donnell saying to Hamilton, the other defendant, that he would have them that night, and they rode ahead of the witness and others, who for some distance went the same road. Richard Clark's house was one mile and a quarter, as the road ran, from that of his father's. Richard Clark swears that on Monday evening, the fugitives being in his fodder house, he kept a watch to see who might attempt to remove them. His intention was, as he states, to retain the fugitives that they might be returned to their master. Between three and four o'clock on Tuesday morning, the witness, being on the watch, saw two men approach. To prevent his being observed he hid himself in the fence corner. The moon had risen an hour and a half or two hours, and gave considerable light. The men entered the fodder house, and in a few minutes came out with the woman and her children, passing close by the place where the witness was concealed, on the opposite side of the fence. They passed between him and the moon, and he saw them so distinctly as to satisfy himself, that they were Donnell and William Hamilton, the defendants. Donnell was nearest him, and he is more confident as to him than as to Hamilton. Donnell was carrying the youngest child. On cross examination the witness said, possibly, he might have been mistaken as to the persons, but he was satisfied in his own mind that he was not. Donnell wore a mixed jean frock coat. The houses of the witness and Donnell's are about one fourth of a mile distant from each other.

At the date of these transactions Peter Noel lived with Donnell, and he states that Donnell told him that he had placed negroes around Woodson Clark's house, at the time of his being there with the search warrant. Emry, a witness, saw the negroes around the house of Clark. Donnell told Noel if it had not been for him the fugitives would

have been safe with their master. On Monday, while Donnell was absent at the Sandwich meeting house, three or four negroes called at his house to see him. Shortly after Donnell's return home in the evening, he left, as he afterward informed the witness, for Greensburgh, to obtain a search warrant for the negroes. Donnell was absent on Monday night, and did not return home until about half an hour before Tuesday morning. On Tuesday morning William Hamilton breakfasted with Donnell, and they left Donnell's house together, between eight and nine o'clock on that morning. Witness heard Donnell say that the negroes belonged to Ray; at what time this was said he does not remember. After breakfast, and before they left Donnell's house, witness heard Hamilton say to Donnell, we will go to Clarksburgh, and baffle the men there in pursuit of the negroes, until they could get the negroes off. Donnell said to the witness that he carried victuals to the fugitives on Tuesday, who were then on the road between Brookville and some other place. The witness, it seems, had a quarrel with Donnell in the fall of 1848, and also a quarrel with his son.

There is some confusion, if not conflict, in the testimony in regard to Donnell's being seen, at home, at the horse mill of Snelling, and at other places on the road, on Tuesday morning.

Granville L. Hindle lives near to Donnell. Witness having said that had he been there, he would have taken back the negroes to Ray, Donnell replied that witness would not have done so, as the children were as white as either of them. Robert Coleman states that Donnell said to him, "The negroes are safe, and Ray will never get them."

To break the force of the evidence of the plaintiff, many witnesses have been called and examined by the defendants. Robert M. Stout states that while Noel was living with Donnell, about two months after the slaves were taken from Clark's, Noel asked witness to tell him about the negro scrape. The witness said, "Why do you not ask Donnell?" Noel replied he had tried him, but could get nothing out of him. Jackson Braden heard Noel say, when inquired of why he did not ask Donnell about the negroes, that he might as well ask the old fellow as Donnell. Peter Noel, on being recalled, denies that he ever made the above statements to Robert M. Stout and Jackson Braden. He says the statements of Donnell were made to him in the presence of no other person. Robert Coleman and twelve other witnesses, being called, impeach the credibility of Noel. His credibility is sustained by about the same number of witnesses.

Robert M. Stout says that in the spring of 1848 he heard Richard Clark say, in the presence of Donnell, that he was satisfied, from Donnell's saying so, that he did not assist in taking the negroes out of the fodder house. That he had known him many years, and

had no reason to doubt his word. Elisha Hobbs states, that on the Friday evening of the escape of the fugitives, he had a conversation with Richard Clark in regard to Donnell being at his place on Monday night, when he said he did not know certainly that Donnell was there. That it was so dark that he could not tell a white man from a black one. That he believed Peyton's negroes took the fugitives away, and that if Peyton did not take care he would have to pay for the negroes. James Petigrew says that he lodged with Richard Clark shortly after the fugitives had been removed. That Clark observed to him there had been a good deal of excitement in the neighborhood respecting some slaves found by his father. That he, through false pretences, had induced them to come to his fodder house, with the view of enabling them to escape. And he observed that his father was independent in his circumstances, and did not need the reward for the apprehension of the negroes. He also said that he did not tell the colored persons in the neighborhood where he had placed the fugitives, but that they understood where the place was, and that the fugitives were removed by them. Clark said the negroes were not then more than half a mile from that place, and he must go and see if they were safe. Witness proposed to go with him, but Clark objected, as he was a stranger in the neighborhood, and the Kentuckians were about. Clark returned about ten o'clock at night, and said the negroes were safe, and on their way to Richmond. He requested witness not to speak of the matter, as it would displease his father, and would be, in a pecuniary point of view, a disadvantage to him. And he also observed, if the facts were known, he might be made liable for the slaves. David Stout says the day after the negroes were taken away, or the next day, he met Richard Clark in the road, near his house, who inquired if he had seen any negroes, etc. On being answered in the negative, he observed that he had had a negro woman and children at his house the night before, and that the negroes came and took them away; but that the woman and her children were still in the neighborhood. Richard Clark on being recalled says he has no recollection of having made the statements in conversations sworn to by Robert M. Stout, Elisha Hobbs, James Petigrew and David Stout. He remembers that he conversed with those persons, but denies that he made the remarks attributed to him.

These are the material facts proved, on which you, gentlemen, are to determine this controversy. There seems to be no doubt that the fugitives were the slaves of the plaintiff, and that they escaped from his service in Kentucky. They answer the description of the plaintiff's servants, the woman confessed that she belonged to him, and they were known to be his by Woodson Clark, who had often seen them at the plaintiffs house. And in addition to this, Donnell, one of the defendants, admitted that they belonged to the plaintiff. And there is no doubt that the fugitives have been lost to the plaintiff. The great question is, whether the defendants removed them from the fodder house or aided in removing them. This fact rests mainly on the statements of Richard Clark and Peter Noel, connected with the circumstances of the case. If the jury shall believe these witnesses, the defendants are guilty. But the credibility of these witnesses has been assailed. Clark is contradicted by his own confessions to the two Stouts, to Hobbs and especially to Petigrew. The statements of Clark made, as they were to these witnesses, are wholly inconsistent and irreconcilable with what he has sworn to on the trial. This inconsistency goes not only to his acts but to his motives also. From his remarks to Petigrew, it would seem that he aided in the removal of the fugitives, and that to accomplish this object he deceived his father, and thereby got possession of them. And they were taken from the fodder house not by the defendants, but by other persons. Never in my experience have I witnessed so great a conflict of statements, among respectable witnesses. The court have refused to hear evidence in support of the general character of Richard Clark and his father, because they had not been assailed on that ground. They have been contradicted, but that does not enable a witness to offer evidence of general good character.

The jury are the proper judges of the credibility of witnesses. Their statements are made in the presence of the jury, who observe their appearance and the manner of giving their testimony. These are important in enabling you to weigh the evidence, and to determine the credit to which the witnesses are respectively entitled. If conflicting statements can be reconciled, it should be done; but where this is impossible, you must decide to whom credit is due. When the scale shall stand upon an equipoise and there is nothing in the evidence which shall incline it to the one side or the other, the jury will find for the defendant. And where such a balance may exist in regard to the credit of a witness, the jury will throw his statements out of the case, and decide upon the other evidence. When we look at the active agency of Donnell in procuring the writ of habeas corpus and in serving it, under the denomination of a search warrant, in which Hamilton the other defendant co-operated; and when they were known to leave the house of Woodson Clark together, with an expression by Donnell that the negroes were at one of the sons of Clark's, and that they would have them, going in the direction of Richard Clark's at a late hour on Monday night, it is clear that they might have removed the fugitives, as sworn to by Richard Clark.

This view is strengthened by the absence of Donnell from his home on Monday night, until a short time before daylight on Tuesday morning; and the defendants being together on that morning at Donnell's, and their subsequent conduct, all conduce to show that they had a most favorable opportunity of doing the act complained of. And they sought this opportunity, it would seem from the evidence, by extraordinary efforts, and a singular combination of circumstances occurred which would have enabled them to perpetrate the act. Whether they are guilty, or not, it is for you to determine. It is no evidence that an individual has done a wrong who had an opportunity of doing it. But if such opportunity be connected with circumstances, from which an inference may be fairly drawn, of an intention to do the act, and the act be done by some one, the opportunity of doing it becomes an important fact.

Circumstantial evidence may prove a fact as satisfactorily as positive proof. And where the circumstances are of such a character as necessarily to implicate an individual, he is required to exculpate himself by proof. If the defendants removed the fugitives from the fodder house, and by that means they were enabled to escape, so that their services have been lost to their master, the defendants are liable in this form of action. That the defendants knew they were fugitives from labor, is shown by the confessions of Donnell, and by the circumstances of the case. To suppose that they could have been ignorant of this knowledge, is to presume against all the facts in the case. Liability attaches from "harboring or concealing" the fugitives. "To harbor" is defined by Worcester to be, "to rescue, to receive clandestinely and without lawful authority." And to conceal is "to hide, to keep secret, to secrete, to cover, to disguise." And by Webster, "to withdraw from the observation, to cover, or keep from sight."

In regard to the damages, should you find for the plaintiff, the court have been requested to charge you, that as a recovery in this case will be no bar to the plaintiff's claim on the fugitives, the damages should be nominal. I can only say that this action is given in the language of the act of congress, for the injury received. And of this you are to judge. The services of the fugitives are proved to have been worth to the plaintiff, by one witness, fifteen hundred dollars, and by another, fifteen hundred and fifty dollars. Whether a recovery in this case extinguishes the right of the master, is not a matter for your consideration, but the amount of injury received by him, by the acts of the defendants. It is clear, that the damages recovered in this form of action, are not given as a penalty. The act of congress gives a penalty to the plaintiff of five hundred dollars against one who has secreted a fugitive from labor, with notice, or for hindering his arrest, or rescuing him after he shall have been arrested.

Slavery is an exciting topic, in whatever form it may be considered; and no political question can be more deeply interesting to any people. But it can only come before us judicially. Here great principles are discussed, and acted on only as they bear upon the rights of litigant parties. The power to establish slavery, in my judgment, does not belong to the federal government. It is not found in the enumerated federal powers, nor can it be implied from the necessary exercise of any one of them; but as a right belonging to the states respectively, it is recognized. The clause in the constitution which has been read, and the act of congress in regard to fugitives from labor, were intended to cover the services of slaves as well as those of apprentices. From the history of the times, we know the recognition of this power in the states, and in this form, was essential to the adoption of the constitution; and on this principle of compromise, the compact of the Union was formed. The constitution has made us one people,—a nation—a great nation;—a nation that stands proudly among the nations of the earth; and, if we shall maintain its principles in the same spirit which led to its formation, our country will be advanced to a height of prosperity, as far beyond that which we now enjoy, as our present position is above that which our fathers occupied when the constitution was formed. If the guaranties of this fundamental law be disregarded, all our hopes for the future, as regards the prosperity, the greatness, and glory of our country must perish. We must stand firmly by the principles of the constitution, and maintain the rights secured by it, to the citizens of the states respectively; and, whatever may be the excitement and turmoil in other places, we must here act calmly and deliberately, free from all influences which do not arise from the facts and law of the case.

The jury found for the plaintiff, and assessed his damages at fifteen hundred dollars.

